UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60476-CIV-DIMITROULEAS/ROSENBAUM

MARLENE WHITTIER, as Personal
Representative of the Estate of Anthony
Diotaiuto, and individually,

        Plaintiff,

v.

CITY OF SUNRISE, a Municipality
of the State of Florida, ANDRE BRUNA,
individually, SEAN VISNERS, individually,
DAVID BOYETT, individually, DANIEL
KOBAYASHI, individually, ERIC GOLDSTEIN,
individually and ERIK PALACIO, individually,

        Defendants,

_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANT CITY OF SUNRISE'S MOTION FOR FEES

     This matter is before the Court on Defendant City of Sunrise's Motion to Tax Attorney's

Fees Pursuant to 42 U.S.C. § 1988 and for Extension of Time to Comply With the Remainder of

Local Rule 7.3, pursuant to an Order of Reference entered by the Honorable William P.

Dimitrouleas. [D.E. 260, D.E. 262]. The Court has reviewed the Motion, Plaintiff's Response [D.E.

274], the Reply [D.E. 275], and the Court file, and has heard argument from counsel at a hearing held

on this matter.[1]   For the reasons stated below, I recommend that Defendant's Motion to Tax

Attorney's Fees be granted in part and denied in part.

_____

[1] The Court has also reviewed Defendant's supplemental filing provided to the Court after
this matter. During the hearing, Defendant sought to file a supplement to address
whether the Court could allow a partial award of fees if the Court found that one or more of
Plaintiff's claims was frivolous, but such claim or claims were included in the same count as a
non-frivolous claim.

## *I. BACKGROUND*

**A.      Overview of the Lawsuit**

The underlying lawsuit involves claims asserted by Plaintiff in her individual capacity and

as the personal representative of her son, Anthony Diotaiuto ("Diotaiuto"), against Defendant City

of Sunrise ("City") and other defendants.  Diotaiuto died following the execution of a search warrant

on Diotaiuto's home on August 5, 2005, by officers of the Sunrise Police Department.  Plaintiff

claimed that one of the individual defendants, a Sunrise Police officer, wrongfully shot Diotaiuto,

resulting in Diotaiuto's death and violating his Fourth Amendment rights.  Consequently, Plaintiff

filed the Complaint against Defendants making counts of battery, negligence, and violation of civil

rights.  [D.E. 9].  With respect to the City, Plaintiff filed a claim pursuant to 42 U.S.C. § 1983[2]

alleging that the City's custom or policy led to violation of Diotaiuto's constitutional rights when

the police (1) used a SWAT team for execution of all search warrants without regard to whether the

circumstances required such use; (2) failed to knock and announce; (3) deployed a flash-bang blindly

or directly at occupants; and (4) considered the execution of all search warrants as "high risk"

situations, thus pretextually justifying the use of force and the City's SWAT team.

**B.      The Search Warrant**

In the early morning hours of August 5, 2005, the City of Sunrise's SWAT team received an

operational plan with respect to executing a search warrant on Plaintiff's home.[3]  The operational

---

[2] Plaintiff also set forth claims against the City for wrongful death – one sounding in
negligence and the other in intentional tort.  The Court addresses only the Section 1983 claims
presented, as those are the claims upon which the City argues that it is entitled to attorney's fees.

[3] Prior to execution of the search warrant, the Honorable John Frusciante signed the
search warrant, which authorized the City to search the premises at any time of the day and
further allowed the City to serve the warrant while occupants were home.  *See* Appendix, Tab 4

plan included the use of an eight-person SWAT team to execute the warrant, directed the team leader to knock and announce police presence prior to entry, and called for the deployment of a flash-bang distraction device before any entry. These tactics were used because after assessment, the Sunrise Police Department classified the warrant as "high risk," which the City defines as "involving acts of violence or potential acts of violence." *See* Appendix to D.E. 135 at Tab 6.[4] During execution of the warrant, the SWAT team was dressed in full SWAT gear with the word "POLICE" displayed on their uniforms. *See* Appendix, tab 10 to D.E. 135. According to various officers, all members of the SWAT team had attended extensive training and had been instructed that flash-bang devices should not be thrown directly at individuals. *See e.g.,* D.E. 138-10 at p. 30.

Before the Sunrise Police Department obtained the warrant, police intelligence revealed that Diotaiuto sold large quantities of narcotics. More specifically, a detective assigned to the Vice, Intelligence and Narcotics Unit ("VIN"), Michael Calise, spoke with one of Diotaiuto's neighbors, who had initiated a call to the Sunrise Police Department to complain about Diotaiuto's drug-dealing activities. As a result, the Sunrise Police Department placed Diotaiuto's house under surveillance, and a confidential informant conducted a controlled drug buy. Intelligence also revealed that Diotaiuto had a prior drug-related arrest. Additionally, the Sunrise Police Department learned that Diotaiuto had a concealed weapons permit and carried a handgun on him at all times. Other sources confirmed that Diotaiuto kept a shotgun in the master bedroom of his closet. Based on all of these

---

to D.E. 135.

[4] In its Motion for Summary Judgment, the City noted that the threat assessment matrix form approved by the National Tactical Officers' Association ("NTOA") would have scored the warrant in the highest risk category possible (35 points or more), based upon Diotaiuto's prior drug-related arrest, the presence of an additional occupant in the home, the access to a shotgun and a handgun, and Diotaiuto's known use of illegal drugs.

factors, the City determined the service of the warrant to be "high risk."  As a result, the City deployed its SWAT team, which it uses for the service of all "high risk" warrants.

On the day that the warrant was served, the SWAT team approached the door, and, according to multiple police officers,[5] team leader Daniel Kobayashi ("Kobayashi") knocked loudly several times and announced the presence of the Sunrise Police and the fact that they were there to serve a search warrant.  Although fourteen officers present at the scene testified that they heard Kobayashi knock and announce, not a single neighbor heard a knock or announcement of the police presence. Rather, three neighbors testified that they were listening at the time and believed that they would have been able to hear the announcement had it occurred.  In an effort to refute the neighbors' contentions, the City retained a sound expert to conduct tests at the site to re-create the knock and announcement under similar circumstances.  According to the City, the tests revealed that even if the neighbors had been paying attention, they could not physically have heard the knock and announcement.

Based on the City's version of the facts, approximately 12-15 seconds after the knock and announcement, the breach team was called in to obtain entry into the house.  Defendant Sunrise Police Officer Eric Goldstein ("Goldstein") operated the Halligan tool, pushing it into the door frame, and Defendant Sunrise Police Officer Erik Palacio ("Palacio") operated the battering ram, striking the Halligan tool with the battering ram.  Both Goldstein and Palacio stated that it took approximately 10 -15 seconds to open the door.  Once the door was pried open, Goldstein indicated that he saw Diotaiuto sitting on the couch inside the residence.

---

[5] A single officer present at the scene did not hear the knock and announcement.

Defendant Sunrise Police Officer Andre Bruna ("Bruna"), however, who was assigned to deploy the flash-bang device, claimed he looked into the house but did not see Diotaiuto inside. Consequently, Defendant Bruna deployed the distraction device in the direction of a back bedroom. The City contends that the flash-bang device detonated in the left rear area of the living room, near the doorway to Diotaiuto's bedroom. *See* Appendix, Tab 10 to D.E. 135.

Upon entering the home, the SWAT team found Diotaiuto in the living room standing in his boxer shorts and staring at the police officers. Team leader Sunrise Police Officer Kobayashi yelled, "Get on the ground." Instead of complying with the demand, however, Diotaiuto began to retreat, running toward the back bedroom of the house, where intelligence had revealed that he kept his weapons. Bruna and another officer, Defendant Sunrise Police Officer Sean Visners ("Visners"), chased Diotaiuto to the back bedroom, where Visners kicked the door open, yelled, "Police," and followed Diotaiuto inside. Diotauito ran into the bedroom closet.

Upon learning that Diotauito was in the bedroom closet, the Defendant officers commanded him not to bring a gun with him out of the closet. Despite the warning, however, Bruna and Visners testified, Diotaiuto racked his gun, came out of the closet holding it, and pointed the weapon at Visners. Visners then opened fire, aiming at center mass and shooting with the admitted intent to inflict fatal injuries immediately on Diotaiuto. After this initial round of shots, Diotaiuto fell back into the closet. Both Bruna and Visners testified that from a seated position in the closet, Diotaiuto began to raise the gun again, at which time both officers yelled for him to drop it. According to Defendants, Diotaiuto disregarded the officers and continued to raise the weapon at Visners. The officers then fired their guns, killing Diotaiuto. Visners next stepped on Diotaiuto's hand, and Bruna removed the firearm and moved it away from Diotaiuto.

5

Both the Broward County Associate Medical Examiner and Plaintiff's own forensic pathology expert agreed that, on autopsy, Diotaiuto showed no signs of injury from the flash-bang device. Instead, Diotaiuto died from the fatal gunshot wounds fired by Bruna and Visners. Plaintiff's forensic expert also testified that no forensic evidence contradicted Bruna and Visners's account of the incident.

**C.**     **The Summary Judgment Motions**

As noted above, Plaintiff filed suit against the City pursuant to Section 1983. During the course of litigation, the City filed a Motion for Summary Judgment [D.E. 133] which Judge Dimitrouleas subsequently granted. [D.E. 238]. In his Order granting summary judgment, Judge Dimitrouleas emphasized that, as a threshold matter, Plaintiff was required to show an actual constitutional violation with respect to her son, Diotaiuto. *Id.* at 7. The Court then addressed each of the four allegations made by Plaintiff against the City pursuant to Section 1983. First, the Court noted that it had previously held that material issues of fact remained with respect to whether a constitutional violation occurred regarding the City's duty to knock and announce.[6]

Next, the Court reiterated that it found no constitutional violation with respect to the deployment of the flash-bang device or the use of deadly force. Indeed, in granting Defendant Andre

---

[6] In the Court's Order denying Eric Goldstein and Erik Palacio's Motion for Summary Judgment [D.E. 218], the Court recognized that the City's expert performed a "field test" and determined that none of the surrounding neighbors would have been able to hear the knock and announcement from where they were positioned. However, the Court acknowledged that the three neighbors had not heard a knock and announcement and believed that they were in a position to have heard any such announcement had it occurred. And, although the City could potentially discredit the three neighbors' testimony using the City's expert, the Court found that the factual determination was one for the jury to decide. Given these circumstances, the Court concluded that material issues remained as to whether the City knocked and announced its presence before entering Diotaiuto's home. Thus, Goldstein and Palacio's Motion for Summary Judgment was denied. *See* D.E. 218 at 7-9.

Bruna'a Motion for Summary Judgment with respect to the deployment of the flash-bang device, the Court found that the evidence advanced by Plaintiff was "entirely insufficient" to raise a genuine issue of material fact.  D.E. 232 at 11.  In so concluding, the Court emphasized that the record – including Plaintiff's own expert's opinion – showed that Diotaiuto did not show any signs of injury, whatsoever, from the distraction device, which suggested that the device did not detonate within any dangerous proximity to Diotaiuto.  *Id.*  Accordingly, the Court found that the evidence conclusively demonstrated that Bruna did not deploy the flash-bang device in the unconstitutional manner accused by Plaintiff.  Thus, the Court granted summary judgment on the claim.  *Id*. at 12.

The Court then turned to the two remaining issues that had not been addressed in its prior summary judgment orders dealing with other defendants in the case: (1) the decision to use the SWAT team for execution of all search warrants without regard to whether the circumstances required such use and (2) the allegation that the City considered the execution of all search warrants as "high risk" situations, thus pretextually justifying the use of force and the City's SWAT team. After considering the undisputed facts and the parties' arguments, the Court found that the mere deployment of a SWAT team in and of itself does not violate the Fourth Amendment.  *Id.* at 9. Likewise, the Court held that the decision to use the SWAT team and make a dynamic entry in the execution of the warrant at issue did not violate Diotaiuto's constitutional rights.  *Id.*  Finally, because the situation in which the City served  the search warrant on Diotaiuto's home was, in fact, a "high risk" situation, the Court determined that Plaintiff had inappropriately asserted that the City classifies all search warrants as "high risk" regardless of any individualized decision-making process. *Id*.  In sum, the Court concluded that three out of four of Plaintiff's Section 1983 claims did not rise to the level of a constitutional violation in this instance.  *Id.*

Having found that the only potential constitutional violation in this case involved the claim alleging a failure to knock and announce prior to entering the Diotaiuto home, the Court then analyzed whether the City could be held liable for any such failure. Ultimately, however, the Court found that "Plaintiff failed to show that the City has a custom or policy of failing to knock and announce, when constitutionally required, before making arrests or serving search warrants." *Id.* at 10. Indeed, the Court found that Plaintiff's allegations fell "far short" of a custom or policy of the City of Sunrise. *Id.* at 11. Thus, Judge Dimitrouleas ultimately granted summary judgment in favor of the City with respect to all of the Section 1983 claims advanced by Plaintiff.[7]

## D.   **The Pending Motion**

After succeeding on its Motion for Summary Judgment, the City filed a Motion to Tax Attorneys' Fees Pursuant to 42 U.S.C. § 1988 ("Motion for Fees"). [D.E. 260]. In its Motion for Fees, the City seeks for the Court to rule only on the issue of the City's entitlement to fees. That motion is now before the Court for consideration.

The City contends that it is entitled to an award of fees because Plaintiff's Section 1983 claims were frivolous, unreasonable, and without foundation, and they could not be supported with any admissible evidence. In arguing its Motion, the City points to what it deems to be strong language used by Judge Dimitrouleas in granting the City's Motion for Summary Judgment. Aside from the language contained in the summary judgment opinions, the City asserts that no evidence supported Plaintiff's claims against the City at the outset and, as discovery progressed, it should have become apparent to Plaintiff that no evidence existed to further the claims. Accordingly, the City

---

[7] The City also prevailed on its summary judgment motion with respect to the two remaining claims for wrongful death.

8

seeks an award of its attorney's fees with respect to the Section 1983 claims brought against it.

Plaintiff objects to the City's assertion that the claims brought against the City were frivolous and, thus, that it is entitled to its fees. Emphasizing that a prevailing Section 1983 defendant must pass a stringent test to obtain an award of attorney's fees, Plaintiff argues that the City can make no such showing. According to Plaintiff, she presented more than sufficient evidence in furtherance of her claims to avoid responsibility for the City's attorney's fees. Thus, Plaintiff asks that the Court deny the City's Motion for Fees altogether.

## II. ANALYSIS

### A.   Standard for Awarding Defendant's Attorney's Fees in a Section 1983 Case

The Court begins with a review of the applicable statute. As Plaintiff proceeded against the City under 42 U.S.C. § 1983, 42 U.S.C. § 1988 governs the award of attorney's fees in this matter. This statute provides, in relevant part,

> In any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The courts have interpreted this statute to allow for an award of attorney's fees as part of an award of costs to a prevailing defendant only where plaintiff's claim was "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978) (addressing Title VII's fee-shifting provision); *Doe v. Busbee*, 684 F.2d 1375, 1378-79 (11th Cir. 1985). Generally speaking, the "plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or

9

groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg,* 434 U.S. at 422. The Supreme Court has specifically applied this standard in civil rights actions brought pursuant to 42 U.S.C. § 1983. *Hughes v. Rowe*, 449 U.S. 5, 14 (1980). The purpose of an allowance of attorneys' fees to defendants in all of these contexts is to protect defendants from burdensome litigation having no legal or factual basis. *Christiansburg*, 434 U.S. at 420.

Whether a plaintiff's claim is frivolous, unreasonable, or groundless must be judged by an objective standard, although if the court finds that a plaintiff has brought or continued a claim in bad faith, a stronger basis exists for charging the plaintiff with the attorney's fees incurred by the defense. *Christiansburg*, 434 U.S. at 422; *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1176-80 (11th Cir. 2005). In this circumstance, the district court "must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Sullivan v. Sch. Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir. 1985) (quoting *Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir. 1981).

In the context of a Title VII case, to which the same standard applies, the Supreme Court has cautioned that in considering whether a plaintiff's claim is frivolous, unreasonable, or groundless,

> . . . it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely

reasonable ground for bringing suit.

*Christiansburg*, 434 U.S. at 421-422.

In reviewing cases where prevailing defendants have been awarded fees, the Eleventh Circuit has observed that courts have sustained findings of frivolity where plaintiffs have failed to "introduce *any* evidence to support their claims." *Sullivan*, 773 F.2d at 1189. (emphasis added). Typically, these cases have been decided in the defendant's favor on a motion for summary judgment or a Rule 41(b) motion for involuntary dismissal. *Id.* Other factors that may be applicable to the decision include (1) whether the plaintiff established a *prima facie* case; (2) whether the defendant offered to settle; and (3) whether the trial court "dismissed the case prior to trial or held a full-blown trial on the merits." *Id*. at 1176-77. The *Sullivan* factors, however, are "general guidelines only, not hard and fast rules," and "[d]eterminations regarding frivolity are to be made on a case-by-case basis." *Id.; e.g., Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1176-1177 (11th Cir. 2005). In making such determinations, the Eleventh Circuit has emphasized that a Section 1983 plaintiff must meet a "substantially lesser standard" to justify a finding that an action is "not frivolous" than the plaintiff must satisfy to survive a motion for summary judgment by demonstrating that a material issue of fact exists. *Cordoba*, 419 F.3d at 1182. Thus, a party is not entitled to its attorney's fees merely because it prevailed on its summary judgment motion. *Head v. Medford*, 62 F.3d 351, 356 (11th Cir. 1995).

Here, it is clear the City was the prevailing party in this matter. The City became the prevailing party once the Court granted its Motion for Summary Judgment. *Jerelds v. City of Orlando*, 194 F. Supp. 2d 1305, 1308-1310 (M.D. Fla. 2002) (civil rights defendant who is granted summary judgment is prevailing party). Thus, the sole question is whether Plaintiff's action was "so lacking in arguable merit as to be groundless or without foundation" by Section 1983 standards.

11

*Sullivan*, 773 F.2d at 1188.  As noted above, however, in making this evaluation, courts must adhere to a strict standard in determining whether to award fees to a prevailing defendant in these circumstances.  Courts applying the *Sullivan* factors have been reluctant to award fees unless the plaintiff refused to acknowledge clear precedent or asserted a claim which she knowingly based on a non-existent interest. *Head*, 62 F.3d at 356; *Cone Corp. v. Hillsborough County*, 157 F.R.D. 533, 540-541 (M.D. Fla. 1994).  Because civil rights laws depend for their vindication on private plaintiffs filing suit, Congress and the courts do not want to discourage plaintiffs from bringing potentially meritorious claims that touch on fundamental rights,  *See Hershinow v. Bonamarte*, 772 F.2d 394, 395 (7th Cir. 1985) by routinely exposing them to the risk of having to pay the defendants' legal fees.  Consequently, the law insists on a stringent standard in determining whether to award fees against a Section 1983 plaintiff.

## B.   <u>Municipal Liability</u>

Important to the Court's determination of whether Plaintiff's claims against the City were frivolous is an understanding of the circumstances under which the City could have been found to be liable to Plaintiff.  In order for Plaintiff to prevail on her Section 1983 claims against the City, she was required to show an underlying constitutional violation by an individual law enforcement officer, as well as an official custom or policy of the City that served as the "moving force" behind the constitutional deprivation. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Wyke v. Polk County School Board*, 129 F.3d 560 (11th Cir. 1997); *Sewell v. Town of Lake Hamilton*, 117 F.3d 488 (11th Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998).  Under Section 1983,  a City cannot be held liable for the actions of its officers under the theory of *respondeat superior*. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).  "[T]he language of § 1983 . . . compels the conclusion that Congress did not

intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused the constitutional tort." *Monell*, 436 U.S. at 691; *Sewell*, 117 F.3d at 489.

To establish a custom or policy, a plaintiff generally must show a persistent and widespread practice. *Depew v. City of St. Mary's,* 787 F.2d 1496 (11th Cir. 1986). For purposes of Section 1983 liability, a "custom" of a local government is a "practice that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489. Likewise, a "policy" is a "decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Id*.; *Monell*, 436 U.S. at 694 (". . . it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). A municipality's failure to correct constitutionally offensive actions of its police department may rise to the level of a custom or policy if the municipality tacitly authorizes the actions or displays deliberate indifference towards the misconduct. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987). Normally, random acts or isolated incidents cannot suffice to establish a custom or policy. *Depew,* 787 F.2d at 1496. Instead, the Plaintiff here was required to show that Diotaiuto was subjected to a constitutional deprivation and that a custom or policy of the City was the moving force behind that constitutional deprivation. *Brooks*, 813 F.2d at 1191.

**C.    Analysis of Plaintiff's Section 1983 Claims**

As noted above, Plaintiff brought suit against the City pursuant to 42 U.S.C. § 1983, alleging that the City's various customs or policies led to violations of Diotaiuto's constitutional rights. More specifically, Plaintiff's Section 1983 claims are based on allegations of the City's failure to knock and announce police presence, improper use of its SWAT team, and the SWAT team's deployment

of a flash-bang device either blindly or directly at occupants.  The Court will analyze each of these contentions in turn.

### 1.  The SWAT Team's Alleged Failure to Knock and Announce

Plaintiff asserts that pursuant to Section 1983, the City had a custom or policy of failing to knock and announce when serving warrants.  In furtherance of this claim, Plaintiff introduced evidence that three other citizens claimed that the SWAT team had failed to knock and announce its presence during the service of warrants.  More specifically, Plaintiff presented the testimony of Brett Gould, Jason Richland, and Toni Stern, all of whom stated that they did not hear a knock and announcement when similar warrants were served at their homes.  Although Plaintiff conceded that the universe of incidents was not large, Plaintiff pointed to a case from the Southern District of Florida, *Brown v. City of Margate*, 842 F. Supp. 515 (S.D. Fla. 1993), *aff'd.* 56 F.3d 1390 (11th Cir. 1995), in which she contended that  the court held that three incidents sufficed to establish a municipality's custom and policy.

Aside from these three other incidents, Plaintiff presented evidence that a policymaker with the City,  the Chief of Police, was "deliberately indifferent" to the knock-and-announcement requirement.  According to Plaintiff, the Chief did not know the purpose of the knock-and-announcement requirement.  Moreover, Plaintiff urged that the SWAT team's use of the "flooding technique" when executing high risk warrants, further demonstrated the existence of the City's policy not to knock-and-announce before executing search warrants.  The flooding technique is based upon surprise and speed when issuing a warrant.  Plaintiff contends that the use of the flooding technique is antithetical to a knock and announcement since it requires surprise, which arguably could not be obtained if an appropriate knock and announcement occurred.  Finally, Plaintiff relies

on the fact that none of Diotaiuto's neighbors actually heard the knock and announcement on the day that the SWAT team executed the warrant on Diotaiuto's home.  For all of these reasons, Plaintiff asserts that her claim based upon a failure to knock and announce is not frivolous.

In contrast, the City contends that Plaintiff's claims regarding the knock-and-announcement requirement are, in fact, frivolous.  In so arguing, the City emphasizes Judge Dimitrouleas's reasoning in the Order granting the City's Motion for Summary Judgment.  In the Order, the Court noted that out of over 550 pages of reports, Plaintiff points to only three instances where she alleges that the City's police department did not knock and announce its presence.  The Court further referred to the fact that two of the individuals in these three incidents, Gould and Richland, testified that they could not say whether the SWAT team knocked and announced prior to entering.  Only the third, Stern, testified that the SWAT team did not announce its presence before entering.  Judge Dimitrouleas found this to be "scant support of a widespread policy."

The Summary Judgment Order also emphasized that the City did not have a single complaint on file from any person claiming that the SWAT team served a warrant upon him or her without properly knocking and announcing.  In short, the Court concluded that the evidence advanced by Plaintiff fell "woefully short" of proving a custom or policy on the part of the City.  Moreover, even without reference to the Court's Order, the City contends that even if Plaintiff were able to cite a few examples of improper conduct, that does not necessarily constitute an official custom or policy of the City, particularly if those incidents went unreported to the City by the alleged victims.  The City claims it has a policy to knock and announce and that Plaintiff failed to present any evidence to the contrary because, of the three witnesses identified, two were unsure whether a knock-and-announcement occurred prior to entry into their particular residences, and the other was sleeping at

15

the time that entry into her home was made.  For these reasons, the City seeks its attorneys' fees for what it deems to be a frivolous claim.

After considering the arguments presented by both parties, the Court finds that although Judge Dimitrouleas understandably granted summary judgment in favor of the City with respect to Plaintiff's allegations that the SWAT team failed to knock and announce, the evidence relating to this claim is not so non-existent as to meet the definition of "frivolous" under a Section 1988 attorney's fee analysis.  *See Sullivan,* 773 F.2d at 1189.  First, it is important to note that there has not yet been a determination whether an underlying constitutional violation occurred with respect to the knock-and-announcement claim advanced by Plaintiff because Judge Dimitrouleas denied individual Defendants Goldstein and Palacio's Motion for Summary Judgment.  In his prior Order on that motion, Judge Dimitrouleas found that a genuine issue of fact existed as to whether a knock-and-announcement occurred in the execution of the warrant on Diotaiuto's residence.  Specifically, Judge Dimitrouleas acknowledged that Diotaiuto's three neighbors had not heard a knock and announcement on the day that the warrant was served, but believed that they were in a position to have heard any such announcement had it occurred.  And, although the City could potentially discredit the three neighbors' testimony using the City's expert, the Court found that the factual determination was one for the jury to decide.  Given these circumstances, the Court concluded that material issues of fact remained as to whether the City knocked and announced its presence, as constitutionally required, before entering Diotaiuto's home.  *See* D.E. 218 at 7-9.

Next, although Judge Dimitrouleas ultimately ruled in favor of the City in finding no custom or policy regarding the City's alleged failure to knock and announce, the granting of summary judgment is not tantamount to a finding that Plaintiff's claim was "frivolous" under a Section 1988

16

attorney's fee analysis. As noted above, the Eleventh Circuit has explained that obtaining a conclusion that a claim is "not frivolous" requires the plaintiff to meet a "substantially lesser standard" than the plaintiff must satisfy to survive a motion for summary judgment by demonstrating that a material issue of fact exists. *Cordoba*, 419 F.3d at 1182. Thus, a party is not entitled to its attorney's fees simply because it prevailed on its summary judgment motion. *Head*, 62 F.3d at 356.

Consequently, the Court must review the specific evidence presented by Plaintiff in support of her claim to determine whether that claim is frivolous. As evidence of the City's custom or policy, Plaintiff pointed to three other instances where she alleges that the City's SWAT team did not knock and announce its presence, as constitutionally required, before entering the private residences. Although the credibility of these witnesses[8] was not particularly strong, Plaintiff was able to present at least *some* evidence that the City's SWAT team may not have knocked and announced at these residences. This evidence, in conjunction with the fact that the Southern District of Florida has previously held that three prior incidents along with other evidence, suffices to create a question as to whether a custom or policy existed, allows Plaintiff to escape a finding of frivolity with regard to this particular claim. *See Brown v. City of Margate*, 842 F. Supp. 515 (S.D. Fla. 1993). In short, while Plaintiff's evidence is minimal, the Court cannot find that Plaintiff's knock-and-announcement claim had *no* evidence to support it.

---

[8] In granting the City's Motion for Summary Judgment, Judge Dimitrouleas found significant the fact that two of the witnesses could not say either way whether the SWAT team knocked and announced prior to entering. Only the third affirmatively stated that the SWAT team did not knock and announce when executing a warrant at her home. However, testimony indicated that this third witness may have been sleeping when the SWAT team initiated its execution of the warrant.

17

In this regard, the Court notes the limited circumstances under which fees have been granted to defendants pursuant to Section 1988.  As previously discussed, in such cases, the plaintiffs did not introduce *any* evidence to support their claims.  *See e.g., Head v. Medford*, 62 F.3d 351 (11th Cir. 1995) (defendant awarded fees where plaintiff's assertion of constitutional claim was based knowingly on a non-existent property interest and, therefore, found to be groundless); *Beard v. Annis*, 730 F.2d 741 (11th Cir. 1984) (defendant's fees awarded where plaintiff failed to rebut assertion that he knew salary cutback and discharge were due to cutback in federal funds); *Jones v. Dealers Tractor and Equipment Co.*, 634 F.2d 180 (5th Cir. 1981) (affirming attorneys' fee award where plaintiff presented no facts supporting the alleged conspiracy and indispensable parties were not joined); *Church of Scientology of California v. Cazares*, 638 F.2d 1272 (5th Cir. 1981) (fees awarded to defendant in Section 1983 action where plaintiff presented no evidence to support claim); *Harris v. Plastics Manufacturing Co.*, 617 F.2d 438 (5th Cir. 1980) (case found to be frivolous where, in race discrimination claim, plaintiff failed to present any evidence that penalties imposed on minorities were different than those imposed on white employees); *Vavrus v. Russo*, 243 Fed. Appx. 561 (11th Cir. 2007) (Section 1983 claim found to be legally without merit where plaintiff failed to introduce evidence supporting allegations); *Evans v. Monroe County Sheriff's Dept.*, 148 Fed. Appx. 902 (11th Cir. 2005) (defendant entitled to fees where arrest that formed basis of complaint never occurred, sheriff's department was not subject to suit, and there was no showing that any alleged constitutional violation was related to county policy); *Jerelds v. City of Orlando*, 194 F.Supp.2d 1305 (M.D. Fla. 2002) (defendants' fees awarded where plaintiff presented no evidence to support discrimination claim); *Ruszala v. Walt Disney World Co.*, 132 F.Supp.2d 1347 (M.D. Fla. 2000) (fees awarded to defendant in Section 1983 action for false arrest due, in part, to fact that

18

plaintiff confessed to crime and testified during deposition that sheriff acted professionally).  By this measure, Plaintiff's knock-and-announcement claim cannot be "frivolous" since, as noted above, Plaintiff presented at least some evidence to support her claim.

Nor does the justifiedly strong language used by Judge Dimitrouleas in the Order granting summary judgment necessarily provide a basis for a contrary conclusion.  Although Judge Dimitrouleas concluded that Plaintiff's allegations fell "far short" of a custom or policy of the City of Sunrise and that Plaintiff had "scant" evidence of such a widespread policy, a finding that a plaintiff presented evidence far short of creating an issue of material fact for summary judgment purposes does not equate to a determination that Plaintiff's claim was "frivolous" within the meaning of a Section 1988 attorney's fee analysis.  *See Cordoba*, 419 F.3d at 1180 (Eleventh Circuit agreed with the district court that Plaintiff "fell far short" of creating a genuine issue as to whether supervisor was aware of disability, but disagreed that the evidence was so obviously deficient that the plaintiff should be forced to pay defendant's attorneys' fees).  Under the circumstances of this case, where Plaintiff presented the testimony of three other witnesses on the custom and policy allegation, along with evidence relating to the "flooding technique," the Court must find Plaintiff's deficient knock-and-announce claim to survive an inquiry into frivolity.

**2.      The City's Use of SWAT**

Within its Section 1983 claim, Plaintiff also alleged that the City had a custom or policy to use its SWAT team for execution of all search warrants without regard to whether the circumstances required such use and because it considered the execution of all search warrants as "high risk situations," thus justifying the use of the City's SWAT team.  Because these claims are somewhat intertwined, the Court will address them together.

The City argues that the record is devoid of evidence that the City used the SWAT team for all entries, that the City improperly deployed the SWAT team for the subject warrant, and that the City classified all search warrants as "high risk" in order to justify the use of SWAT.  In support of its contention that these claims lacked any arguable merit, the City points to the language of the Court in its prior Order granting the City's Motion for Summary Judgment.  In the Order, the Court noted that the record showed that the City could fairly expect that its properly trained SWAT team, which had never been the subject of a civilian complaint or lawsuit, and never had an officer discharge his firearm during an operation, would safely serve the search warrant.  *See* D.E. 238 at p. 9.  Based upon these facts, the Court found that the decision to deploy the SWAT team and to utilize a dynamic entry in the execution of a high-risk warrant did not violate Diotaiuto's constitutional rights.  *Id.*   As Plaintiff did not meet the requirement to show an underlying constitutional violation, the City claims that Plaintiff failed to establish a *prima facie* case.

The City also contends that Plaintiff further did not place any evidence into the record showing that an unconstitutional custom or policy precipitated any underlying violation.  While the City acknowledges that perhaps the lawsuit might have had merit had a history of SWAT problems, prior firearms use, or civilian complaints existed in this case, the City points out that Plaintiff did not set forth any such evidence of past improper use of the SWAT team.  Instead, Plaintiff merely argued that the City used the SWAT team to execute narcotics warrants.  Based on the fact that the City had no prior problems with the use of SWAT, no civilian complaints, and no lawsuits, the City contends that Plaintiff's claims were wholly unsupported and groundless.  According to the City, in light of the SWAT team's exemplary record, the City should not have been made to expend resources defending its customs and policies in this lawsuit.

20

Plaintiff disagrees with the City and states that she presented evidence in support of her claims and, therefore, should not be ordered to pay the City's attorney's fees. In furtherance of her position, Plaintiff relies on the testimony of Robert Biondolillo ("Biondolillo"), a former captain with the Sunrise Police Department. Biondolillo testified during his deposition that the City's police chief decided that the SWAT team was going to perform entries for search warrants served by the narcotics unit. When Biondolillo voiced his concern about using the SWAT team for all such search warrants, the chief allegedly responded that the team needed practice.[9]

In addition, Plaintiff directs the Court to the fact that a lieutenant at the department provided a sworn statement in which he averred that the City employed the SWAT team for all entries. Third, according to Anthony Bennett, a member of the VIN unit, VIN qualifies all of its entries to be high risk such that the SWAT team assists with all of the VIN unit's warrant entries. Finally, Plaintiff contends that she submitted the City's training logs as evidence that the SWAT team was, in essence, using the execution of actual search warrants to train the City's SWAT team members. More specifically, Plaintiff points to a "training" log entry that reflects the execution of an actual warrant. Based upon this evidence, Plaintiff asserts that her claim had merit and was not frivolous.

The Court first notes that Plaintiff's claims relating to the City's use of the SWAT team are properly read as an excessive force claim under the Fourth Amendment. A claim based on such alleged constitutional violation is legally viable if Plaintiff is able to set forth sufficient evidence in support of her claim.

---

[9] The City notes that Biondolillo retired from the Sunrise Police Department in 1997 – approximately 8 years prior to the incident. Additionally, the City emphasizes that Biondolillo testified to the practice of merely using SWAT, and did not cite any examples of improper or unlawful use.

The Court, therefore, conducts a review of the evidence presented by Plaintiff. Determining whether Plaintiff's claim is frivolous and, thus, whether the City is entitled to its attorneys' fees is a closer question in this instance. On the one hand, the City set forth evidence that it did not use its SWAT team for all search warrants, but rather, only for VIN-related warrants which were deemed to be "high risk" warrants. The City also carefully distinguished situations where a single SWAT team member accompanied another officer in executing a low-risk warrant. The Court agrees with the City that, contrary to Plaintiff's position, such a situation is not the same as deployment of the SWAT team. Although the City uses a single SWAT officer in these instances for officer safety, it is clear that the officers could not make the same dynamic entry in executing such a warrant as if the entire SWAT team were present. Another factor that makes the Court's determination of fees difficult here is that it does not appear to be disputed that the NTOA grid would have scored the warrant at issue to be in the highest risk category possible based on Diotaiuto's prior drug-related arrest, the presence of an additional occupant in the home, the access to a shotgun and a handgun, and Diotaiuto's use of illegal drugs. Even Plaintiff's tactical expert, John Peters, did not refute this fact, but instead stated that a force matrix is very subjective and not a legal standard for force. *See* D.E. 159-9 at p. 144.

Ultimately, Judge Dimitrouleas found that Plaintiff's claims with respect to the City's use of the SWAT team were inappropriately asserted because the situation was, in fact, a "high risk" situation. D.E. 238 at 9. In making this determination, Judge Dimitrouleas emphasized that, Plaintiff did not seriously contend that the situation was not "high risk." And, because the situation was "high risk," deployment of the SWAT team was entirely reasonable. Finding that there was no underlying constitutional violation, Judge Dimitrouleas stated that he was "not prepared to hold that

a search warrant to search the home of a suspected felony quantity drug dealer, who was known to keep a weapon on him at all time[s], had additional weapons in the house, and carried a concealed weapons permit was not a "high risk" warrant." *Id.* at 10.

While the City's position with respect to this claim is strong, the Court cannot find that Plaintiff's position was so weak that it is "frivolous" by Section 1988 attorney's fee analysis standards. With respect to whether Diotaiuto's constitutional rights were violated by the City's use of the SWAT team, Plaintiff relied on the testimony of one of its experts, John Peters, in advancing its claim. Specifically, Peters testified during his deposition that, in his opinion, the SWAT team and the tactics that it employed should not have been used in the underlying situation. *See generally*, D.E. 159-9. In this regard, Peters stated repeatedly throughout his deposition that the SWAT team should have served the search warrant when Diotaiuto was not present in the home in an effort to minimize the risk of injury to all parties. *See e.g., id.* at p. 110-11. Additionally, Peters opined that the SWAT team's training policies and procedures were not appropriate. *Id.* at p. 129. In particular, Peters disagreed that it was appropriate to use the SWAT team for every narcotics situation. *Id.* Given this expert testimony, it is difficult for Court to find that Plaintiff presented **no** evidence supporting her claim and thereby justifying the entry of a fee award against Plaintiff.

Moreover, with respect to whether Plaintiff's "custom or policy" assertions had any merit, it is noteworthy that the Court had no reason to analyze these contentions, in light of the Court's ruling that the warrant at issue was clearly justified as being characterized as a "high-risk" warrant. Because he found that Diotaiuto did not suffer an underlying constitutional violation, Judge Dimitrouleas did not need to proceed to the *Monell* "custom or policy" analysis. In this regard, Judge Dimitrouleas noted that because no underlying constitutional violation occurred, "it [was]

immaterial whether the City policy was such that a potential constitutional violation might possibly have been permitted." *Id.*   This statement of course, cuts both ways.   Because Plaintiff's claims were weak, at best, it would have been a waste of judicial resources to proceed to determine whether the City had a custom or policy of using its SWAT team for all warrants.   On the other hand, there was no affirmative determination by the Court that the "custom or policy" aspect of Plaintiff's claim would not have been met.

With this in mind, the undersigned has gone back and carefully reviewed the "custom or policy" evidence advanced by Plaintiff.   After consideration of the evidence presented by Plaintiff in this regard, the Court finds that Plaintiff did set forth at least some (although truly minimal) evidence that such a policy could have existed.   As noted by Plaintiff, a former captain with the City's Police Department, Biondolillo testified that the police chief decided that the SWAT team was going to perform entries for search warrants served by the narcotics unit.   And, according to Biondolillo, when he voiced his concern about using the SWAT team for all such warrants, the chief proceeded with his decision.   In fact, Biondolillo testified that the chief stated that he felt that the SWAT team needed practice.   While, at best, it is highly questionable whether the City's use of its SWAT team in executing all narcotics warrants would have enabled the Court to find that the City had a custom or policy as asserted by Plaintiff, neither can the Court conclude that Plaintiff failed to introduce ***any*** evidence to support her claim and, therefore, that the claim was "frivolous" by Section 1988 attorney's fee analysis standards.   Instead, I recommend a finding that although the evidence advanced by Plaintiff was certainly deficient, it was, nevertheless, just enough to escape a finding of "frivolity" under the "stringent" Section 1988 attorney's fee award standard.

24

### 3. The SWAT Team's Deployment of Flash-Bang Device

Finally, Plaintiff claimed that the City was deliberately indifferent to Diotaiuto's constitutional rights because it had a custom and policy of deploying flash-bang devices directly at occupants of a dwelling or blindly into their dwellings.  The City first argues that Plaintiff lacked evidence that such a blind deployment at Diotaiuto occurred in this case.  In this respect, the City points to the medical examiner's report, as well as to Plaintiff's own forensic expert's opinion that Diotaiuto did not sustain any injuries due to the deployment of the flash-bang device.  Moreover, the City contends that even if evidence existed, Plaintiff would have been required to establish that the City had a custom and policy of blindly deploying such devices at individuals and that this custom or policy served as the moving force behind the alleged deprivation at issue.  The City emphasizes that Plaintiff failed to cite to a single other incident where the City threw a distraction device blindly or directly  at someone or where such conduct was approved by the City.  To the contrary, the City states that it had received no prior complaints from any civilians regarding the use of distraction devices in their homes.  Based on all of these facts, the City argues that Plaintiff's claims were frivolous and, therefore, the City, as a prevailing defendant, is entitled to its fees.

Plaintiff disagrees and states that she presented evidence that the City had a custom or policy of unreasonably deploying flash-bang devices.  As an example, Plaintiff points to the fact that the City's SWAT Standard Operating Procedures ("SOPs") cover deployment of flash-bang devices, but do not restrict officers from blindly throwing devices into a structure or at a suspect.  Additionally, Plaintiff emphasizes that during his deposition, SWAT Team Leader Kobayashi testified that the location of suspects is not taken into account when deploying the devices and that he throws the devices "toward" the suspects.  In further support of her position, Plaintiff cites Detective Michael

Calise's testimony that when he participates in high-risk warrants, the SWAT team always uses flash-bang devices.  Plaintiff also relies on *Taylor v. City of Middleton*, 436 F. Supp. 2d 377 (D. Conn. 2006), in which the court announced that it could not conceive of a set of circumstances that would permit an officer to throw a flash-bang device directly at a person.  Finally, Plaintiff points to this Court's own Order denying the City's Motion to Dismiss, in which it stated that flash-bang devices could not be used as a routine matter.  In light of these facts, Plaintiff asserts that she presented enough evidence to overcome any finding of frivolity.

The Court begins by recognizing that Plaintiff's legal theory, considered in isolation, was potentially viable.  In this regard, other courts have found that throwing a flash-bang directly at a subject may result in a constitutional violation.  *See Taylor v. City of Middleton*, 436 F. Supp. 2d 377 (D. Conn. 2006) (court stated that it could not imagine a set of circumstances that would permit an officer to throw a flash-bang device directly at a person).  Likewise, throwing a flash-bang device "blindly" into a dwelling can also give rise to a Fourth Amendment violation.  *See Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004) ("[G]iven the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw it "blind" into a room occupied by innocent bystanders absent a strong government interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury.").  Accordingly, this is not a case where the Court can conclude that Plaintiff's claim had no potential legal basis or that Plaintiff refused to acknowledge clear precedent contrary to her claim.

The Court's inquiry, however, cannot end with an evaluation in a vacuum of Plaintiff's legal theory.  Instead, the Court must also consider whether Plaintiff's claim has any factual basis or whether it is frivolous due to a failure to introduce evidence to support her claim.  Unlike Plaintiff's

26

two other claims against the City, I recommend that the Court find Plaintiff's claims with respect to the use of the flash-bang device to be frivolous. I make this recommendation after carefully reviewing the record and evidence advanced by Plaintiff in support of her claim. After such review, I conclude that Plaintiff did not present any proof that the flash-bang device was thrown either directly at Diotaiuto or blindly into his home and, therefore, an award of fees should be granted.[10]

First, the Court reviews the evidence that Plaintiff contends supports her claim. Plaintiff relies on the testimony of Detective Calise in which he stated that the SWAT team always uses flash-bang devices when he participates in high-risk warrants. Plaintiff also points to the fact that the Court, in its Order denying the City's Motion to Dismiss, previously stated that flash-bang devices should not be used as a routine matter. A careful review of the Amended Complaint, however, reveals that this evidence is not relevant to and, therefore, does not support Plaintiff's claim. In Count V of the Amended Complaint, Plaintiff alleges that the City's customs and policies, "which were deliberately indifferent to [Diotaiuto's] constitutional rights, included, but were not limited to the following: . . . c. Deploying flash-bang grenades directly at occupants of a dwelling or blindly into their dwellings." D.E. 9 at 16-17. Thus, it is clear that the Amended Complaint alleges

---

[10] The Court acknowledges that it is appropriate to make a partial award of fees to the City where a frivolous claim asserted against it is included in the same count as a non-frivolous claim. See *Quintana v. Jenne,* 414 F.3d 1306 (11th Cir. 2005); *Wallace v. City of Tarpon Springs*, 2007 WL 2265617 (M.D. Fla. Aug. 6, 2007); *Lusega v. Albrecht & Albrecht, Inc.*, 2008 WL 779332 (N.D. Ga. Mar. 24, 2008); *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055 (9th Cir. 2006). Here Plaintiff brought four separate claims against the City, although it combined its claims in one count alleging Section 1983 violations. The fact that Plaintiff set forth, in a separate count against Defendant Bruna, a single claim for improper deployment of the flash-bang device based upon identical underlying facts, demonstrates the viability of that claim as a separate count. The Court further notes that Plaintiff does not appear to challenge the Court's ability to make such an award, since she did not file any opposition to the City's supplemental brief on this issue.

constitutional violations against the City for the *manner* in which it allegedly deploys flash-bang devices.

Because the evidence set forth above by Plaintiff merely addresses the *frequency* of the City's use of flash-bang devices rather than the *manner* in which the City deployed the flash-bang device, it has no bearing on, and does not support Plaintiff's claim.  It is irrelevant how many times the City's SWAT team has used a distraction device because such evidence sheds no light on whether the device was used improperly.  Indeed, even if the SWAT team used a flash-bang device each time it executed a warrant, the frequency of use cannot bear on Plaintiff's claim if the device was deployed properly in all of those situations.  Here, in order to support her claim, Plaintiff must present evidence to show that the manner in which the SWAT team deployed the flash-bang device (*i.e,.* throwing it directly at a suspect or blindly into a dwelling) was improper.  The Court agrees with the City that Plaintiff's evidence and arguments regarding the frequency of the City's use of flash-bang devices do not support Plaintiff's claim as set forth in the Amended Complaint.

In support of her claim, Plaintiff also relies on *Taylor*, a case in which the court stated, as noted previously, that it could not imagine a set of circumstances that would permit an officer to throw a flash-bang device directly at a person.  While Plaintiff certainly had every right to rely on *Taylor*, she was ultimately required to present evidence that proved that the flash-bang device in this case was thrown either blindly or directly at her son.  Unlike the facts in *Taylor*, however, no evidence in this case even suggests that Defendant Bruna threw the device in such a manner.  In *Taylor*, one of the plaintiffs testified that she saw an officer look directly at her and "lob some sort of explosive device into the air toward . . . me." *Id.* at 380.  That plaintiff also testified that she saw the device land on top of the co-plaintiff's thigh, which was draped across her lap. *Id.* at 381.

Moreover, one of the plaintiffs sustained lacerations and burn injuries and the other suffered injuries to her eye, face, and eardrum. *Id.*

Plaintiff's claim may have possibly had merit had there been evidence similar to that presented in *Taylor*. Here, however, Plaintiff advanced no such evidence. To the contrary, the record contains direct, uncontradicted evidence indicating that Officer Bruna did not throw the device directly at Diotaiuto. Indeed, the physical evidence and Plaintiff's own experts' opinions undermine Plaintiff's claim in this regard. First, it is undisputed that the Broward County Assistant Medical Examiner concluded after autopsy that Diotaiuto showed no signs of injury from the flash-bang device. Likewise, Plaintiff's own forensic expert, Dr. Michael Baden, confirmed this finding, stating that he did not see "any evidence of any physical injury caused by a flash bang device on [Diotaiuto]." D.E. 138-2 at p. 60-63.

Moreover, both Plaintiff's tactical and audiological experts testified during their depositions on this point. Plaintiff's tactical expert, John Peters agreed that no documents showed that Diotaiuto suffered any physical injury from the flash-bang device. D.E. 159-8 at p. 107, 126, 181. Additionally, Thomas Thunder ("Thunder"), Plaintiff's audiologist, testified that he did not see anything in the autopsy report or anywhere else that suggested that Diotaiuto was physically injured by the flash-bang. D.E. 138-50 at p.112-113. This medical evidence suggests that the device did not detonate within any dangerous proximity to Diotaiuto and, more important, was not thrown

directly at Diotaiuto.[11]  Thus, as Judge Dimitrouleas held, "[t]he evidence advanced by the Plaintiff

is *entirely insufficient* to raise a genuine issue of material fact."  D.E. 232 at 11.  (emphasis added).

Plaintiff's best evidence that the flash-bang device was thrown blindly in this case is the

inference Plaintiff urges the Court to make that Defendant Bruna lied in his testimony regarding the

deployment of the flash-bang device.  In this regard, during his deposition, Officer Bruna stated that

he looked into the house before deploying the flash-bang device, but he did not see Diotaiuto inside

the room.  As evidence that Bruna was lying, Plaintiff emphasizes that Bruna's testimony conflicted

with Defendant Goldstein's testimony.  During Officer Goldstein's deposition, Goldstein testified

that he did see Diotaiuto sitting on the couch in the living room just before Bruna threw the device

inside the home.  Plaintiff argues that this discrepancy provides merit to her claim and supports the

contention that Bruna did not see Diotaiuto inside the home because he did not look, and simply

threw the device into the house blindly.  As aptly noted by Judge Dimitrouleas in his Order granting

summary judgment on this claim, the fact that another officer saw Diotaiuto and Bruna did not, does

not prove that Bruna did not look into the portion of the house where he was instructed to throw the

flash-bang device.  D.E. 232 at 11.

Taking this evidence in the light most favorable to Plaintiff, the Court cannot say that

Plaintiff's claim was frivolous from the start.  Due to the alleged discrepancy between Officers

_____

[11] Considering that Diotaiuto was in the room adjacent to Officer Bruna when Bruna threw the flash-bang, and in view of the coordination and skills necessary for SWAT team members to possess, it seems highly unlikely that Bruna would have been unable to throw the flash-bang device near Diotaiuto, had he tried to do so.  Indeed, had a member of the SWAT team, who obviously had to pass agility and coordination tests as well as engage in physical training, wanted to throw the device at a suspect, he could have done so. A flash-bang is an explosive device.  Thus, the fact that Diotaiuto sustained no physical injury from the device confirms that he must have been a safe distance away from its detonation.  Accordingly, there is no evidence that Defendant Bruna threw the device at Diotaiuto.

30

Bruna and Goldstein's testimony, while this evidence is weak and would not have supported a motion for summary judgment, it cannot be said that Plaintiff's claim had no factual merit from its inception. Plaintiff's claim, however, became untenable when her three experts confirmed that Diotaiuto sustained no direct physical injury from the flash-bang device. The fact that Diotaiuto showed no signs of injury, whatsoever, from the distraction device effectively eviscerated Plaintiff's claim. Indeed, this evidence to the contrary firmly cemented the fact that the flash-bang device did not detonate within any dangerous proximity to Diotaiuto and, thus, was thrown neither directly at Diotaiuto nor unconstitutionally blindly.[12]

Notwithstanding the fact that there is no evidence that the flash-bang device was thrown at Diotaiuto or unconstitutionally blindly into his home, neither does the evidence exist in the record that the City has a policy or custom of throwing flash-bang devices directly at occupants or blindly into buildings. Unlike her other claims, Plaintiff did not cite to a single other incident where the City's SWAT team threw the distraction device blindly or at someone, or where that type of conduct was condoned by the City. As pointed out by the City, Plaintiff failed to bring forth any other individuals who claimed that the SWAT team threw a flash-bang device at them or blindly into their home during the execution of a warrant. Likewise, Plaintiff did not demonstrate that there were even any prior complaints by any civilians regarding the use of a distraction device in their homes. Instead, as evidence that the City had a custom or policy, Plaintiff relied on the fact that the SOPs cover deployment of flash-bang devices, but do not expressly prohibit officers from throwing a device into a structure blindly or at a suspect. The Court, however, disagrees that the absence of such a reference in the SOPs equates to evidence that the City allowed or encouraged flash-bangs

---

[12] *See supra* at n.11.

to be deployed blindly into dwellings.[13]  *See Boyd*, 374 F.3d at 784 (finding that plaintiff could not

survive summary judgment on her *Monell* claim by relying on the lack of a written policy).

Likewise, Plaintiff's reference to Defendant Kobayashi's deposition testimony does not

support Plaintiff's custom or policy claim.  In this regard, Plaintiff emphasizes that during his

deposition, Kobayashi testified that when the SWAT team utilizes a flash-bang, it throws the device

"toward" a suspect.  Plaintiff argues that this testimony demonstrates that SWAT team members, or

at least Kobayashi, purposefully threw distraction devices at suspects.  Upon a thorough review of

the record, the Court cannot agree that Kobayashi's testimony fairly can be read to support such a

conclusion.  Instead, a more accurate interpretation of Kobayashi's testimony is that he expressed

the idea that flash-bang devices are thrown in the general vicinity of a suspect to obtain the desired

result, but within a safe enough distance away from the person so that the suspect is not injured by

the device.  Indeed, Kobayashi (as well as Bruna) testified that in SWAT school and during in-

service training, SWAT team members, including Bruna, were specifically taught *not* to throw flash-

bang devices directly at people or blindly, under normal circumstances.[14]

_____

[13] The lack of a directive in the SOPs instructing officers not to throw flash-bang devices directly at occupants or blindly into buildings no more equates to a policy or custom of the City's condoning or encouraging of such behavior than the absence of guidance instructing officers not to handcuff infants, from an SOP advising officers to secure all subjects in a home during the execution of a search warrant, tends to demonstrate that the City had a policy or custom of handcuffing infants while executing search warrants.

[14] A more literal interpretation of Kobayashi's testimony is that he thought it would be a "very rare" situation, but a flash-bang device could be thrown toward a suspect if that person were armed and standing directly in front of the SWAT team.  *See* D.E. 138-32 at p. 64.  Because of the uncontroverted evidence in the record demonstrating that the City trained its officers regarding the manner in which to deploy a flash-bang device, in attempting to show a custom and policy to support her claim, Plaintiff cannot rely on an argument that the City had a complete failure to train.

Ultimately, I conclude that Plaintiff's claim lacked factual support and, thus, once Plaintiff's own experts reached conclusions effectively precluding a factual finding that Bruna threw the flash-bang device directly at Diotaiuto or unconstitutionally blindly into the room where Diotaiuto was, the continued prosecution of the claim was unreasonable within the meaning of a Section 1988 attorneys' fees analysis. As Judge Dimitrouleas found, "[T]he uncontradicted evidence in this case conclusively shows that the Defendant did not deploy the flash-bang device in the manner accused by the Plaintiff." D.E. 232 at 11-12. Likewise, Plaintiff failed to set forth any evidence at all that the City employed any such policy or custom. Due to the absence of any supporting evidence, particularly in the face of overwhelming evidence to the contrary, I recommend that the Court find Plaintiff's claim to be frivolous and award the City its attorneys' fees from the time that Plaintiff's expert reviewed the medical examiner's report and provided Plaintiff with his conclusion that the evidence showed that Diotaiuto did not suffer any direct physical injury from the flash-bang device. From this point forward, Plaintiff was on notice that her claim lacked merit. *See Christiansburg*, 434 U.S. at 422 (plaintiff should not be assessed opponent's fees unless the court finds that plaintiff continued to litigate after claim clearly became frivolous).

### III. CONCLUSION

For the foregoing reasons, and based upon a thorough review of Defendant's Motion to Tax Attorney's Fees [D.E. 260], Plaintiff's Response, Defendant's Reply, the supplemental filings, and the Court file, I hereby **RECOMMEND** that

1.      Defendant City of Sunrise's Motion to Tax Attorney's Fees [D.E. 260], be **GRANTED IN PART AND DENIED IN PART** consistent with this Report and Recommendation.

2.      The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (*en banc*); 28 U.S.C. § 636(b)(1).

**FILED AND SUBMITTED** in Fort Lauderdale, Florida, this 6th day of March, 2009.

_____
ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:     The Honorable William P. Dimitrouleas
        Counsel of Record

34